Good morning, and may it please the court. My name is Stephen Montoya. I'm here representing the appellant. This case is complex and difficult because it involves a judiciary. Otherwise, I don't think it's complex. Factually, there are some legal complexities. The district court granted summary judgment on behalf of the state defendants, reasoning in dismissing Ms. Hellman, the appellant's retaliation claim, that Ms. Hellman was not engaging in protected activity when she released two internal memos of the Arizona State Court of Appeals regarding the allegation of discrimination against a judge. Counsel, I'm interested in your comments on the nature of the alleged adverse employment action. What is the adverse employment action here? Is it more than ostracism or an uncomfortable work environment? What does the record tell us? Your Honor, the record is replete of evidence that this court has concluded explicitly to be retaliatory in the context of this federal civil rights laws, specifically Title VII of the Civil Rights Act and Section 1983 and Section 1981. Threats of termination, threats of discipline, threats of criminal prosecution. Have any threats been carried out? No. But the threats themselves, under this Court's well-established case law, are actionable and retaliatory. For example — As an adverse employment action? Yes, Your Honor. Cite a case for me. Yes. It's this Court's opinion in Colzalter v. City of Salem, a 1983 case, 320 Fed 3rd at 976, decided by this Court in 2003. Quote, this Court's words, under the reasonably likely-to-deter tests, some, perhaps all, of the following acts considered individually were adverse employment actions for purposes of plaintiff's retaliation suit. For example, an unwarranted assignment of blame, a reprimand containing a false accusation. Those are official actions by an employer. Yes, Your Honor. And that's what happened in this case. Judge Weisberg's threats of disciplinary action are adverse actions by an employer. Clearly, Judge Weisberg — They're not actions. They're threats of action. Well — There's a difference between a threat of an action and an action. Well, let me go on, Your Honor. Excuse me. Do any of those cases that you're relying on post-date the Supreme Court's 2006 opinion in which the Court defined adverse employment action to require something that is actually materially adverse? And if not, don't we have to just go with what the Supreme Court said in 2006 about what an adverse employment action is? Okay. Two questions. Okay. First of all, in Casalter, a threat of disciplinary action, quote, unquote — that's this Court's own words — constitutes an adverse employment action. Now, in reference to your questions, Judge Graber, this Court in Ray v. Henderson adopted the reasonably likely-to-deter standard before the United States Supreme Court adopted it in Burlington Northern. This Court's case law — Now, Burlington Northern says that an adverse action — yes, it has to dissuade a reasonable person, but it actually has to be a materially adverse action. I disagree, Your Honor. It doesn't say that. In fact, Chief Justice Roberts in Burlington Northern specifically states a failure to even invite an employee to a friendly lunch — not an official lunch, but a lunch like, hey, let's go to lunch — can constitute an adverse employment action. For example, suppose you're an associate at a law firm, and the senior partner invites promising young associates to lunch, but the promising young associate who complained of discrimination in the workplace is not invited. Chief Justice John Roberts in the Burlington Northern case actually said that could constitute an adverse employment action. The reasonably likely-to-deter test clearly would prohibit a threat of disciplinary action. Ask yourself, if a supervisory agent of an employer threatens an employee with termination, if you report me to the EEOC, I will fire you. That is a threat. What reasonable employee is going to risk termination in the face of that threat? This Court's opinion in Kosalter is good law. It actually anticipated the Supreme Court of the United States' decision in Burlington Northern. This Court got it right years before the Supreme Court of the United States actually adopted the same test. In fact, I believe that the Burlington Northern case and this Court in Ray v. Henderson and Kosalter actually had it right before any other court did. It used to be that there had to be some type of material change. You have to suffer demotion, termination, suspension. And then the Court realized, well, threats are enough. A threat by a supervisory employee is enough to deter a reasonable employee from complaining. And remember, the Supreme Court has an express tradition of broadly interpreting the anti-retaliation provisions of Title VII. Which brings me back to Title VII. The participation clause prohibiting retaliation says anyone who participates in any manner, quote, unquote, is protected from retaliation. Clearly providing documents to an EEOC charging party is participating in an EEOC investigation. The district court cited three cases saying, purportedly supporting the proposition that Ms. Hellman did not engage in protected activity. However, in none of those three cases, Harris, Jeffries, and O'Day was an EEOC charge pending. There was no EEOC charge investigation at the time. And remember, the courts are uniform in concluding that the participation clause of the anti-retaliation provision of Title VII is broader than the opposition clause. Because the purpose of the participation clause is, according to the Supreme Court of the United States, to provide, quote, unfettered access, unquote, to the administrative mechanisms that allow the EEOC, a law enforcement agency, a federal law enforcement agency, to enforce federal anti-discrimination laws. So there is no question that under the express terms of Title VII of the Civil Rights Act, Ms. Hellman was participating in an EEOC investigation when she gave Regina Pengrill those documents, which Regina Pengrill ultimately gave to the EEOC. Judge Martone, the district court below, concluded that, hey, these were confidential documents. And Title VII doesn't apply to confidential documents, but these documents weren't confidential under State law. Well, it isn't really even that they – I think the argument is that any threats of discipline were wholly justified. I think that's the reason why it matters whether they were confidential, because justified disciplinary actions, even if carried out, are not necessarily discriminatory. I mean, if you're late to work every day, you're late to work every day. Do you understand my question? I absolutely do. But the reason why the district court believed that the threats were justified is because the documents were allegedly confidential under State law. But when you look at the applicable State law in question, they weren't confidential under State law. Under the applicable Supreme Court rule, which is the State court rule that governs confidentiality in the State courts of Arizona, all administrative and court records are open to the public. It's Arizona Supreme Court Rule 123, Section 1, open records policy. You think that – Even personnel records? Yeah. Good point, Judge Tashima. Even personnel records under subsection E1G, which is in Supplemental Excerpts of the Record, Volume I, page 569, it reads, even personnel records are open if, quote, the information authorized to – is authorized to be released by the individual employee. In this case, one employee, Ms. Hellman, was releasing the information to another former employee, Ms. Pangrel. These documents involved Ms. Pangrel. Ms. Pangrel, by asking Ms. Hellman for the documents, was clearly authorizing their release. That's on page 569. How could Ms. Pangrel have known of the documents? Ms. Hellman told them about her. Right. Which is sort of the point, isn't it? That these were internal court communications which a disloyal employee then leaked to a former employee. Well, Your Honor, and that's kind of the – in some ways, that's the crux. It's our position that these documents were not confidential as a matter of law under Rule .123. However, they certainly were not confidential as a matter of fact. Okay. Well, first of all, three employees testified that they had never even heard of Rule 123. And this is of the record. There was a law clerk who testified named Jessica Quickel. She had clerked for two judges of the Arizona Supreme Court. She was asked in her deposition – this is in the record – what did you think was confidential? Nothing. In fact, her judge told her, if you didn't want something on the front page of the paper, don't read it. The only thing, according to her, that was confidential under Arizona court rules were work product, deliberations involving the decisions of the court. Regina Pangrel, in her deposition, also testified to that. Luce Hellman, who was the judicial assistant to two different judges, first Judge Lankford, second Judge Kessler, testified that she had never even heard of Rule 123. Moreover, Judge Weisberg himself, before these memos were even released, released the very same information to a personal friend as a friend. The district court said, well, he was releasing this information to this personal friend of his in his capacity as a judge. But that's not what the record says. The record, I asked Judge Weisberg, were you releasing this information to him as a friend? And he said yes. He got a personal phone call from a friend, Judge Ehrlich's husband. And he told them all about the same information. The question of whether, if the court wanted this information to be held confidentially, of course it had to keep it confidential. When Judge Weisberg released this information to a friend, speaking to him as a friend, he waived that confidentiality. Certainly a jury could so conclude. The question of whether or not these documents were in fact confidential was disputed, and that issue could only be resolved by the finder of fact at trial. I would like to reserve my remaining time for rebuttal. Thank you. Thank you, counsel. You may do that. Thank you. May it please the Court. My name is Rachel Boccalzo. I'm an Arizona Assistant Attorney General, and I represent the Appalese, the State of Arizona, and the Honorable Sheldon Weisberg. I'd like to jump in and address some issues that Mr. Montoy raised that I don't think are supported by the record. The adverse actions that Ms. Hellman alleged in this lawsuit are threats of termination and prosecution, a verbal reprimand from her supervising judge, Judge Kessler, ostracism, criticism, and she was called untrustworthy. The record does not support threats of termination. She went to the judges, surreptitiously copied the conversation. You have a copy of that in the record. And she admitted that she had leaked confidential memos to a former law clerk. She says she was threatened with termination. It's not true. Judge Weisberg, within two days of that confession, sent a memo to all of the judges. Kennedy, when you say not true, though, isn't that a contested issue of fact? It isn't. She acknowledges, Judge, that Judge Weisberg, and it's in the record as well, sent a memo or an email to all of the judges deferring any disciplinary action to Judge Kessler. Judge Kessler told Ms. Hellman at that confession, it's on the tape, that he would not terminate her. She acknowledges in her deposition that he said that, and he repeatedly said that throughout time. And when she still wasn't satisfied, six months later, Judge Kessler sent her two memos saying that he was not going to terminate her, Judge Weisberg was not going to overrule that decision, and that she was not going to be prosecuted. There is no evidence in the record to support threats. There was evidence to support a fear, and maybe that was more motivated out of a sense of remorse, but there was no threat that could ever be carried out because Judge Weisberg deferred to Judge Kessler. That never changed. And that was within two days of the confession. As to the ostracism and criticism claims, Judge Weisberg had an independent attorney come in and investigate that. The factual findings do not support a retaliation Ms. Hellman had alleged. But what Judge Weisberg said in that investigation is really important. He said that unless there was some evidence that people were refusing to work with Ms. Hellman, and that was affecting the court's operations, he would put a stop to that, but he could not force employees to interact with her or to trust her or to socialize with her. He was right. That was beyond his jurisdiction. Sotomayor There's one piece of testimony in her deposition that she found herself unable to work as a team with the other J.A.s to produce opinions at Supplemental Excerpt 472. Is that about her work, her ability to carry out her work? What she said was, Judge, that she had difficulty reserving conference rooms, that people didn't look at her, that people looked down or just had minimal contact with her. But Judge Kessler confirmed that there was no prohibition on getting his work done, and Judge Weisberg said he would stop that if that occurred. Her statement is not supported any further in the record. What does it have to be in the procedural posture that it's in? Well, there was no evidence that the court's operations stopped, and it doesn't have to be. She is trying to establish that she suffered a materially adverse action and that there is no evidence in the record that that occurred. What about the cases that Mr. Montori cited about what could amount to adverse employer action? The White decision does require a materially adverse action. The Court specifically said that we need to differentiate trivial harms from significant harms. Ostracism is something that the Supreme Court acknowledged could reasonably arise if somebody complains about discrimination. That's a trivial harm. There was no discipline, no specific reprimand in the file. People just avoided her for a period of time, but the investigator found, it's in the excerpts of records starting at 116, that no judge directed that to occur, and there really was no other adverse impact on her employment, starting with the threats and carrying through, through criticism. The vice chief judge called her untrustworthy. That was the other part of her claim. But she was untrustworthy. What came out through discovery in the litigation was she not only stole these memos and gave them to a former law clerk, she surreptitiously copied, tape-recorded her confession and two more discussions with Judge Kessler. Anything that occurred to Ms. Hellman was not materially adverse. The district court got it right, and there are no facts that a reasonable jury could find in her favor on. As to the standard of the participation clause, no court has adopted such a broad interpretation of the statute. It is true that O'Day and the untopinions focused on the opposition clause, but this Court said that violations of legitimate workplace policy are to be given deference. They are not protected activity. Congress never intended for employees to flaunt violations of workplace rules or violations of workplace rules that were violated. Specifically, Judge Weisberg, as chief judge, and her supervisor, Judge Kessler, and this is in the record, found that she had violated Supreme Court Rule 123. Ms. Hellman relies on the incorrect provision of Supreme Court Rule 123. The provision that she violated pertains to memoranda by judges or drafts, and I will get that citation for you, about where judges are deliberating on administrative matters. That's at supplemental excerpt of Record 56-3 at 89. That's Supreme Court Rule 123, subsection E-8B. Those matters are closed. This is not an employment record. These memos were deliberate. The judges were deliberating on what to do and how to respond to the EEOC charge. Specifically, Judge Weisberg said that he summarized for the judges that an EEOC charge had been filed. He summarized the allegations. He said that he did not find them credible. He had personal knowledge of some of the allegations because they pertain to his chambers, but he specifically asked for information from the other judges. And taking that lead, Judge Lankford drafted a memo in response. Judge Lankford concedes that he didn't know what Ms. Pengrel's specific EEOC allegations were, but he went on to set forth additional concerns that he had about Judge Ehrlich. Well, those matters were being investigated by the Commission on Judicial Conduct. And Ms. Hellman said that she felt compelled to steal the information and give it to Regina Pengrel. She didn't give it directly to the EEOC. I think that's an important distinction here. And under the Fifth Circuit, Jeffrey's case, the district court analyzed a possible exception as contemplated to a violation of workplace rules. The Fifth Circuit in Jeffrey's said, well, if there's a need to violate policy, such as that information is going to disappear, then possibly an action that even violates policy might be brought within the realm of Title VII's protection. There was no threat that either the memos or the information contained in those memos would disappear. Judge Weisberg sent his memo to every judge on the court. A copy could have been obtained from them. And the information really was nothing more than a summary and a request for information so a response could be provided. Judge Langford was helping his wife. He went to the spy headquarters and helped her purchase tape recording equipment. After he had listened to one of her surreptitious recordings, he had spoken to the Associated Press at length about Judge Ehrlich. He had also spoken to her attorney. And he had written a memo to the Attorney General's office. That information he readily provided to other individuals and entities. He equally could have provided it to the EEOC if that was the objective. Lawful means existed in this case, and Ms. Hellman chose to violate policy. There was no need. The district court correctly held that her conduct is not protected under Title VII. She did not suffer a materially adverse action under Title VII. No reasonable jury could find in Ms. Hellman's favor on these facts. Turning to her First Amendment claim, she also has to establish protected speech, and that requires two steps. And it's important, I think, to remember that the speech at issue is her expressive conduct. Her expressive conduct has to first touch on a matter of public concern, and that can be determined by looking at the form, the content, and the context of her conduct. She focuses solely on the content of the memos and ignores the form of her conduct. The form of her conduct was a willful violation of court confidentiality. She acknowledged, she signed an acknowledgment. It's in the record that she would abide by court policy. She knew that these court records were confidential. She questioned before she gave the memoranda to Ms. Pengrel whether she was doing the right thing. Advice came through Regina Pengrel's attorney, who is Mr. Montoya, that her conduct is protected, and that is why she gave the memos to Regina Pengrel. She knew very well that when an envelope is marked confidential, she's not supposed to open it. Judge Kessler refers to a judicial canon in one of his letters. Is that a basis for discipline? Is that a rule that's binding on her? Yes, it is. Canon 3 requires court confidentiality as well. Supreme Court rule applies to the entire judicial branch in Arizona, not just the Arizona Court of Appeals. The canons apply equally. There are a host of confidentiality requirements. Some come from the judges, either through the ---- Was Canon 3 enforceable in any way? Who enforces Canon 3? Let me change the question. That's an employment issue. So if there is a violation, the employer can take action. But there's also an Arizona statute under Title 38 that may provide for prosecution if an employee takes confidential judicial information and releases it. But those canons apply to court employees as well as to judges? I believe so, yes. I'm not sure about the judges. They're elected officials, Your Honor. But I do believe they apply to the entire judicial branch. The memos under Supreme Court Rule 123 required authorization by law. So Ms. Hellman knew. She had been a longtime secretary. She knew that releasing confidential information was prohibited. She said in her confession she didn't care. She knew. She thought she was doing the right thing. She didn't care that she was going to get looks from other employees. She went ahead with it anyway, and now wants the court to protect her conduct. So what is your point at all? Is it that her, I guess, one, her expressive First Amendment conduct is the release of the memos, right? Yes, it is, Your Honor. And two, you're saying what? That's not protected by the First Amendment? It is not protected by the First Amendment. Because it violates the workplace rules? Actually, no, Your Honor, because the court first looks at her conduct, the form, the content, and the context, her desire to help her friend. But then the next step is her interest in helping her friend has to outweigh the court's interest in maintaining a harmonious working environment. That's the Pickering balancing test. We've cited a number of cases outside, of course, this jurisdiction on pages 27 through 31 of the answering brief where bailiffs, legal secretaries, law clerks took some action that impaired the court's unique working environment. This Court, in the Rendish case, Gregorish, and Wisebush case, recognized that some working environments are so unique that they only flourish on trust, confidentiality, and cooperation. The court correctly balanced the interest in favor of the judiciary. Because Ms. Hellman's actions actually disrupted the working environment. Actual disruption isn't required, but a threat of disruption. And in the balance of interest, even if your conduct touches on a matter of public concern, if it disrupts the court's operations or even threatens to do so, the conduct will not be protected speech. The district court got it right. That is not to say that under no circumstances would the balance tip in favor of the judicial employees in any of the cases we've cited, and they shouldn't here. She says that Judge Weisberg had threatened her with termination. We've already covered that. There was no adverse action. This case tests the parameters of protected speech. Legitimate workplace rules ensure order and efficiency, and they deserve deference. And at most, the possibility of discipline and being criticized would deter future violations of workplace policy, not protected activity. And I'm nearly out of time, unless the Court has questions. I don't believe that any of us has any further questions for you. Thank you, Your Honors. Thank you. Mr. Montoya, you have a very short amount of time remaining. Retaliation. Adverse Employment Action. Volume 3 of the record, page 470. Ms. Hellman would try to get a conference room to help her judge do his work. She couldn't get one after she released the documents. That is an adverse employment action. This is the record, Volume 1. Does an adverse employment action need to be done by one's employer? It can be imposed by other people. By other employees, yeah. She couldn't, if you can't ---- Employees who are not in a position of supervision over her? Well, if you ---- People who don't speak to her in the lunch room, we can all of a sudden conclude that that's an adverse employment action? Well, Your Honor, I didn't say that, and that's a closed question. But the person who hands out conference rooms in a court is someone that's different than not speaking to someone in a lunch room. Ms. Hellman needed a conference room to do her work for a judge. After she complained, she couldn't get it. The record, Volume 1, page 47. Judge Weisberg threatened, quote, Judge Weisberg threatened to fire me and then tried to pressure Judge Kessler to terminate me after Judge Weisberg decided that he did not have the authority to fire me. Judge Kessler told me that they, meaning Chief Judge Weisberg and any other judges on the court that he could persuade to go along with them, would try to have her criminally prosecuted. That would deter any reasonable employee from complaining. And remember, in the summary judgment context, the facts and the inferences have to be construed in Ms. Hellman's favor. Ms. Hellman didn't steal anything. She got these documents at home. This isn't the case like in O'Day where the employee snuck into work and started rifling through somebody else's desk. Her husband gave her the memo, said she could read it. Her husband even asked her to help him edit and proofread his response to the memo. Counsel, you have exceeded your time, and we are aware of your arguments. Thank you very much. I understand, Judge. Thank you, Judge Graber, and thank the rest of the Court. Thank you. We appreciate the arguments from both counsel. The case just argued is submitted.
judges: Tashima, Graber, Bybee